24CA1378 Peo in Interest of MC 03-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1378
Weld County District Court No. 22JV8
Honorable Anita Crowther, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of M.C., a Child,

and Concerning H.C.,

Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Gomez and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 20, 2025

---

Bruce T, Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

Just Law Group LLC, John F. Poor, Denver, Colorado, for Appellant

¶ 1     H.C. (mother) appeals the juvenile court's judgment terminating her parent-child legal relationship with M.C. (the child). We affirm.

## I.     Background

¶ 2     In January 2022, the Weld County Department of Human Services received a report that mother, who had been serving a community corrections sentence in Weld County, could not care for the newborn child. After an emergency placement hearing, the court ordered the child into the Department's temporary legal custody, and the Department placed him in foster care.

¶ 3     The Department filed a petition in dependency and neglect. Mother admitted the petition, and the court adopted a treatment plan for her. It required her to (1) cooperate with case professionals and stay in touch with the caseworker; (2) attend all scheduled family time; (3) complete substance abuse and mental health evaluations and follow all recommendations; (4) submit to urinalysis testing; and (5) provide for the child's basic needs and maintain appropriate housing.

¶ 4     Four months after the court adopted her treatment plan, mother transitioned to the Department of Corrections (DOC). In

July 2023, the Department moved to terminate mother's parental rights. Two months later, mother was released from DOC and moved to an El Paso County community corrections facility. She served two months there before her mandatory release date.

¶ 5 In July 2024, after a multi-day hearing, the court granted the Department's motion and terminated mother's parental rights.

## II. Reasonable Efforts

¶ 6 Mother asserts that the Department failed to make reasonable efforts to rehabilitate her and reunify her family. We are not convinced.

## A. Preservation

¶ 7 The child's guardian ad litem (GAL) contends mother did not adequately preserve her reasonable efforts challenge and we therefore should not consider it. *See People in Interest of S.N-V.*, 300 P.3d 911, 913 (Colo. App. 2011) (recognizing that divisions of this court disagree on whether a parent may challenge reasonable efforts for the first time on appeal). Because the outcome is the same either way, we consider mother's arguments. *See People in Interest of A.N-B.*, 2019 COA 46, ¶ 27.

### B. Applicable Law and Standard of Review

¶ 8 Before the juvenile court may terminate parental rights under section 19-3-604(1)(c), the department must make reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. "Reasonable efforts" means the "exercise of diligence and care" as to a child who is in out-of-home placement. § 19-1-103(114). This standard is satisfied by providing services in accordance with section 19-3-208. *Id.*; *see also People in Interest of C.T.S.*, 140 P.3d 332, 335 (Colo. App. 2006). Among the services section 19-3-208 contemplates are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b).

¶ 9 The services must be "appropriate to support the parent's treatment plan." *S.N-V.*, 300 P.3d at 915. Accordingly, the juvenile court should "consider[] the totality of the circumstances and account[] for all services and resources provided to a parent to

ensure the completion of the entire treatment plan." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 10    The parent is ultimately responsible for using the services to comply with the plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). And the court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 11    Whether a juvenile court properly terminated parental rights — including whether the department satisfied its obligation to make reasonable efforts — presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *See People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15; *see also People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. The credibility of witnesses; the sufficiency, probative value, and weight of the evidence; and the inferences and conclusions to be drawn from the evidentiary facts are within the juvenile court's discretion. *People in Interest of S.K.*, 2019 COA 36, ¶ 41. Thus, we will not set aside a juvenile court's factual findings if the record supports them. *Id.* But we review the juvenile court's legal conclusions de novo. *Id.*

4

C. Mother's Treatment Plan Services Including Family Time

¶ 12 Mother argues that the Department "roundly failed" to make reasonable efforts to rehabilitate her. Mother also asserts, more specifically, that the Department failed to provide appropriate family time. We perceive no basis for reversal.

¶ 13 The court determined that the Department made reasonable efforts to support mother's success with each treatment plan objective, including family time, but that mother did not engage. The record supports the court's findings. For instance, the Department maintained contact with mother throughout the case — including monthly visits to DOC during her incarceration — despite mother's "volatile" behavior when the caseworker made contact. Months before the termination hearing, mother tested positive for drugs; she would have therefore been unsuccessfully discharged from El Paso County Community Corrections had she not reached her mandatory release date. Mother participated sporadically in mental health services throughout the case, making little progress. She provided the caseworker with no evidence that she could meet the child's financial needs. And she testified at the termination hearing that she had no housing.

¶ 14 As for mother's specific claim regarding family time, we acknowledge that the record does not clearly show that mother received family time for twelve months of her DOC incarceration. Under different circumstances, this scenario would constitute a lack of reasonable efforts. *See People in Interest of A.A.*, 2020 COA 154, ¶¶ 31-35 (where a juvenile court completely cuts off visitation between a parent and child without showing how it is necessary to protect the child, there have not been reasonable efforts pursuant to section 19-3-604(2)(h)). But "accounting for all services and resources provided to [mother]" over the course of the case, it is clear mother was offered family time but did not consistently engage. *See My.K.M.*, ¶ 33.

¶ 15 Mother's counsel, at a hearing during this period, appears to inform the court that she was able to make "little video or phone visit[s]" happen. Nevertheless, at the termination hearing, the caseworker testified that virtual visits did not occur during the first twelve months of mother's DOC sentence. The caseworker explained that virtual family time was not "allowed" during this period even though other virtual services were apparently available to mother — such as virtual appearance at family team meetings.

6

Again the record is not clear about when or how frequently mother participated in those other virtual services. Relying on the record of efforts during this portion of mother's incarceration alone, we would conclude that the Department did not make reasonable efforts to provide mother with family time.

¶ 16    However, the record shows that mother was offered family time before and after her incarceration, and she did not consistently attend. For instance, when mother was in Weld County Community Corrections, she had twice-weekly in-person family time with parent coaching, supervised at a departmental facility. Mother attended only approximately half of the more than forty visits offered.

¶ 17    While mother attended family time for the last five months of her incarceration, she was less consistent in the eight months since her release, ending visits hours early without warning "four or five" times. During visits mother was unprepared and unable to manage the child's behaviors. The caseworker opined that, as of the termination hearing, despite having in-person visits with mother since August 2023, the child had no relationship with mother.

¶ 18    Mother argues that her "tense relationship" with the caseworker undermined her family time, but she waited more than

a month to schedule an intake with a parenting time facility in El Paso County, which would have ended caseworker-supervised visits. At the time of the termination hearing, a new family time supervisor and parent coach had supervised mother's last three visits in Colorado Springs, even though the child was in Greeley.

¶ 19 Given this record, which supports the court's findings and meets the legal standard, reasonable — if imperfect — efforts were made to provide mother with family time.

### D. Mother's Other Contentions

¶ 20 We are unpersuaded by mother's claim that the Department did not make reasonable efforts to reunify her family when it did not timely inform her of the date of the child's ear tube surgery. Assuming without deciding that this communication was required under reasonable efforts — mother points to no authority to indicate that it is — we perceive no basis for reversal. The caseworker testified that it is the Department's policy to seek consent from parents when a child living in foster care needs surgery. And, while the procedure had been discussed multiple times during family team meetings, the caseworker admitted that she did not tell mother about the specific date the child's surgery

was scheduled. Nevertheless, the record indicates that mother twice consented to the child's surgery, and that the caseworker informed mother about the child's progress during and after the procedure. Even if this was error, it did not impact the outcome of the case or impair the basic fairness of the proceeding. *See People in Interest of R.J.*, 2019 COA 109, ¶ 22.

¶ 21 Mother also argues that the caseworker should have provided her with parent coaching and anger management therapy. But mother does not explain how the coaching she received before and after her incarceration does not constitute parent coaching. Nor does she explain how access to an anger management course would have made any difference when she only sporadically engaged with mental health therapy designed to help her cope with the same issue.

¶ 22 Mother also claims that she should have been provided a "Boundaries" course, Trust Based Relational Intervention therapy, and life skills services. The record shows that the caseworker did not seek out these treatment options for mother — in part due to the caseworker's unfamiliarity with the services or whether they were offered in El Paso County. But a department has "discretion

to prioritize certain services or resources to address a family's most pressing needs in a way that will assist the family's overall completion of the treatment plan." *My.K.M.*, ¶ 33. So whether a department made reasonable efforts "must be measured holistically rather than in isolation with respect to specific treatment plan objectives." *Id.* at ¶ 35.

¶ 23   Overall, the record supports, and we conclude, that the Department made reasonable efforts to support mother's treatment plan objectives.

### III.   Less Drastic Alternatives

¶ 24   Mother also argues that the juvenile court erred in concluding that the maternal grandparents (intervenors) were not a viable less drastic alternative to termination. Thus, mother contends, termination was not in the child's best interest. We perceive no error.

### A.   Applicable Law and Standard of Review

¶ 25   Implicit in the statutory criteria for termination is the requirement that the juvenile court consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986). When considering less drastic alternatives, the court

must base its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3).

¶ 26　　When deciding whether permanent placement with a relative is a viable less drastic alternative to termination, the court may consider various factors, including whether an ongoing relationship with the parent would be beneficial or detrimental to the child. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38. "[L]ong-term or permanent placement with a family member or foster family, short of termination, may not be a viable less drastic alternative if it does not provide adequate permanence that adoption would provide or otherwise meet a child's needs." *Id.* at ¶ 41.

¶ 27　　For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be in the child's best interest. *A.M.*, ¶ 27. If the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.

¶ 28　　When the juvenile court considers the availability of a less drastic alternative and determines that termination of a parent's

rights would be in the child's best interests, we are bound to affirm the court's decision if its findings enjoy record support. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Additional Facts

¶ 29 Days before this case opened, maternal grandparents finalized their adoption of three children, including one of the child's older siblings. At that time, maternal grandmother was protected from mother by a restraining order. Maternal grandparents intervened when this case opened.

¶ 30 Maternal grandmother later petitioned to have the restraining order dismissed and she sometimes joined mother during family time with the child. During those visits, mother and maternal grandmother would frequently argue, yell, and use inappropriate language. Nevertheless, maternal grandmother testified that her relationship with mother was "better than ever," and maternal grandmother testified that she would allow mother "unlimited access" to the child.

¶ 31 The intervenors had been the subject of at least one previous home study, which resulted in placement being denied for another child. The Department completed another home study in

September 2022, which was also denied. The court granted mother's request for a continuance to complete a third home study, this time by an independent evaluator. Mother found an evaluator, who did not complete her home study after the Department pointed out that the evaluator was not state approved. Mother requested a new independent home study. The court again continued the termination hearing to give mother time to complete it. Nevertheless, mother was not "able to conduct a[n independent] home study."

¶ 32    One month prior to the termination hearing, mother was strangled unconscious by maternal grandfather while the children were present. Maternal grandfather was charged, among other things, with child abuse. The court issued a restraining order that initially prevented maternal grandfather from contacting maternal grandmother or mother. By the time of the termination hearing, maternal grandmother had amended the restraining order to apply only between mother and maternal grandfather. Nevertheless, at the time of the termination hearing, there was an open child welfare assessment for the children in intervenors' home.

## C.  Analysis

¶ 33    Mother contends that (1) the court did not properly consider the child's bond with intervenors or that the intervenors were raising other children — including the child's sibling; (2) the home study denial was improperly based on minor issues that intervenors were not given time to remedy; and (3) mother was "prevented . . . from obtaining a second home study for intervenors in order to rebut the Department's conclusions."  First, we are aware of no law, nor does mother point to any, requiring a court to consider a bond between the child and proposed placement when determining less drastic alternatives.  *Cf. People in Interest of D.P.*, 181 P.3d 403, 408-09 (Colo. App. 2008) (a court may consider the child's bond to a parent).  Second, nothing in the record reflects that the court relied on the challenged home study findings in reaching its conclusion.  And, third, as we describe below, the record supports the court's findings.

¶ 34    The court, explicitly considering the child's mental, physical, and emotional conditions and needs, determined that intervenors would not be protective of the child and were therefore not an appropriate placement.  The court expressed concern about the

arguments that occurred during maternal grandmother and mother's visits with the child. And the court had "concerns that there [was] continued violence" in intervenors' home considering the many restraining orders in the case as well as maternal grandfather's recent charges. Finally, the court relied on maternal grandmother's testimony that, if she were to be given custody, "that custody would essentially revert to [mother]." Thus, the record supports the court's findings that there were no less drastic alternatives to termination.

¶ 35    The court's determination that the child's best interests were served by termination is also supported by the record. The caseworker testified that the child needed "stability and certainty in his life," and an allocation of parental responsibilities "would cause disruption in [the child's] life as [well as] . . . dysregulation."

## IV.    Disposition

¶ 36    The judgment is affirmed.

JUDGE GOMEZ and JUDGE LUM concur.

15